UNITED STATES of America, Plaintiff,

v.

FMC CORPORATION, Defendant.

No. CR–75–172.

United States District Court,
W. D. New York.

March 18, 1977.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (Kenneth A. Cohen, Buffalo, N. Y., of counsel), for the Government.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y. (Paul B. Zuydhoek, Buffalo, N. Y., of counsel), for defendant.

CURTIN, Chief Judge.

The Government indictment charges the defendant with thirty-six counts in violation of 16 U.S.C. § 703, the Migratory Bird Treaty Act.[1] The indictment arises from the death of some ninety-two migratory

---

1. 16 U.S.C. § 703 states in pertinent part:
 . . . it shall be unlawful at any time, by any means or in any manner, to . . . kill . . . any migratory bird . . . .

birds found near a lagoon on property owned by the defendant. This case is presently before the court on three motions brought by the defendant, namely, to dismiss the indictment, to suppress certain evidence acquired by New York State officials, and to grant a jury trial.

At a court hearing on December 21, 1976, attorneys for both parties made presentations to the court. At that time I denied the motion to dismiss the indictment, while taking the other motions under further consideration.

## MOTION TO DISMISS INDICTMENT

I denied the motion to dismiss the indictment because it is premature. This motion may not be decided on the information given in the bill of particulars. Since the indictment arguably states a proper charge, it may not be dismissed at this stage of the proceedings. The Government,

however, is directed to prepare a pretrial memorandum explaining the standard of conduct proscribed by the statute and explaining the burden of proof placed upon the government to establish such violation.[2]

## MOTION TO SUPPRESS EVIDENCE

Defendant has moved under Federal Rule 41(e) to suppress all evidence obtained from its premises which is the basis for Counts 1 through 13 of the indictment, upon the grounds that such evidence was obtained illegally in violation of the fourth amendment and of 16 U.S.C. § 706.

For some time prior to this action, the defendant has cooperated with the New York State Department of Environmental Conservation [DEC] in an attempt to insure that discharges from the defendant's lagoon into Jeddo Creek were properly monitored to eliminate pollution.[3] On April 25, 1975, Mr. Paul Forsch of the DEC asked to in-

2. I am concerned about the application of 16 U.S.C. § 703 to bird deaths allegedly the result of drinking waste water discharged into defendant's lagoon. I have been unable to locate any cases where the statute has been applied in a similar situation with the exception of *United States v. Union Texas Petroleum*, CR–73–127 (D.Colo.1973) (not officially reported) [birds killed by open oil sludge pits]. That case left the question of "purposeful killing" open for proof at trial, but, since the case never went to trial, the issue has never been expressly adjudicated.

As stated in *United States v. Olson*, 41 F.Supp. 433, 434 (W.D.Ky.1941), the fundamental purpose of the Act is:

. . . the protection of migratory birds from destruction in an unequal contest between the *hunter* and the bird . . . . (Emphasis added).

This interpretation is supported by the language found in the Convention with Great Britain, 39 Stat. 1702, and with Mexico, 50 Stat. 1311, to which the Act gives effect. A similar reading is found in the debate over increased penalties under the Act. H.R.Rep.No.1787, 86th Cong., 2d Sess. 1 (1960). Migratory birds are killed by many accidental means, such as jet airplanes, air pollution and the windows of tall buildings. Their nests and eggs are destroyed in clearing land for housing, recreation and highways. Can the Government charge land developers and high rise building constructors with the deaths of birds under the statute?

Finally, this question also has a great impact upon the potential sentence under the statute. If 1,000 birds had been found dead at the lagoon, would defendant be subject to a $500.00 penalty for each? It may well be appropriate to have a different unit for sentencing. The court requests that the Government submit its position on sentencing in its pretrial memorandum.

3. At the time of the events charged in the indictment, FMC Corporation had a permit to discharge water from the lagoon into Jeddo Creek which flows into Johnson Creek and then to Lake Ontario. In October 1974 wastes from the lagoon discharged into Jeddo Creek resulted in a fish kill downstream in Johnson Creek. On April 8, 1975 FMC Corporation and the New York State Department of Environmental Conservation entered a Consent Decree related to discharges into Jeddo Creek to maintain the standards for water purity established for the creek by DEC.

Under the Consent Decree, FMC Corporation is to notify DEC of any unusual occurrences or deviation from normal operating procedures which may contribute to a violation of water quality standards. Furthermore, authorized State representatives are permitted access to inspect the FMC facilities to insure compliance with the Order. FMC then posted a surety bond of $10,000.00 to be forfeited if FMC failed at any time to comply with the order before July 1, 1977. This does not prejudice the right of the Commissioner to institute further actions against FMC.

spect the lagoon area due to a report of a bird kill. He was permitted to view the area and to collect some bird carcasses.[4] On May 7 and May 9, 1975, DEC representatives again collected bird carcasses and water samples, but defendant claims that it was not warned of any potential criminal repercussions from its cooperation with the DEC. Not until May 15, 1975, when Mr. Leonard E. Lisenbee, a Special Agent for the United States Department of the Interior, came to the plant, was it announced that a criminal complaint was under investigation. At that point, the defendant made the decision to permit the federal inspection. The motion to suppress concerns the evidence prior to May 15.

 The United States Supreme Court has time and again underscored the essential purpose of the fourth amendment to shield the citizen from unwarranted intrusions into its privacy. *Jones v. United States*, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). By general rule, a person or his property cannot be searched unless the authorities have a search warrant. 357 U.S., at 497, 78 S.Ct. 1253. The fourth amendment applies not only to citizens but to corporations as well. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). No statutory provisions dispense with the warrant requirement in this case. On the contrary, Congress explicitly imposed the warrant requirement on searches under the Migratory Bird Treaty Act.[5] However, in this motion we deal with the search and seizure made by state officials. These are covered by fourth amendment standards, but not the statutory requirements of 16 U.S.C. § 706. *See Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

 The Government argues that no search warrant was required here because

such a search was found permissible in *United States v. Swann*, 377 F.Supp. 1305 (D.Md.1974); *McDowell v. United States*, 383 F.2d 599 (8th Cir. 1967); and *United States v. Cain*, 454 F.2d 1285 (7th Cir. 1972). Each of these cases, however, involves the "open fields" doctrine which has been recognized as an exception to the warrant requirement under the fourth amendment. *See Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *see also Air Pollution Variance Board v. Western Alfalfa Corp.*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974).

 Defendant's Middleport plant includes a completely fenced-in facility of approximately 100 acres and a separately fenced lagoon of approximately 10 acres. The fence around the lagoon is 8 feet high, topped with barbed wire. Access to the lagoon through the fence is at a main gate which is approximately 150 feet from the fence of the main plant across the public utility easement. There is one other small gate used in connection with pond drainage. According to the affidavit of William C. Cole, Jr., the plant manager, it is defendant's practice to keep both gates closed and locked except when plant personnel are in the lagoon area. This court finds that the highly restricted access to the lagoon and the manner in which it was enclosed do not permit application of the "open fields" exception in this case.

 The Government also argues that the defendant consented to the search by the state officials. It claims that the defendant was aware of its criminal jeopardy pursuant to New York Environmental Conservation Law at the time of the search and that as a result both the search and seizure were performed with the defendant's full consent. As the Government points out,

---

4. Affidavit of William C. Cole, Jr., plant manager at FMC's Middleport plant, dated August 29, 1975, ¶ 4.

5. Under 16 U.S.C. § 706 a Department of Interior employee when authorized by the Secretary of the Interior to enforce § 703 shall have the authority, *with a search warrant,* to search any

place. (Emphasis added). The legislative history of the Act and the Tenth Circuit decision in *Aiuppa v. United States*, 338 F.2d 146, 148–149 (1964), both confirm the absence of power to make a warrantless search on probable cause under the Act.

the Supreme Court in *Schneckloth v. Busta-monte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973), has narrowed the consent standard for searches to one of voluntary consent which is not the result of duress and coercion, expressed or implied. According to the Court, voluntariness in this context

> is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

The DEC officials who inspected the lagoon were permitted to enter defendant's land under a consent decree entered into with the defendant. Its purpose was to eliminate the release of Furodan into Jeddo Creek and thus prevent criminal liability for water pollution. Under a strict interpretation of the fourth decretal provision of the order, DEC officials were not specifically authorized to take bird carcasses.[6] However, after request by DEC officials, the defendant freely allowed them to remove the carcasses in question.[7] I therefore find that the search of the lagoon and the seizure of the bird carcasses by state officials properly fall under the consent exception to the fourth amendment requirement of a search warrant as set out in *Schneckloth*. Defendant's additional requests for suppression of product lists and memoranda of statements made by defendant's employees are denied since no legal basis for their suppression has been demonstrated.

Finally, defendant asserts its claim that even if the defendant's fourth amendment rights were not violated by the initial search and seizure by state officials, the warrantless seizure of such evidence from the state authorities by federal agents violated defendant's constitutional rights. In support of this argument it cites *United States v. Birrell*, 470 F.2d 113 (2d Cir. 1972), where, in a situation involving both state and federal authorities, the court stated: ". . . a search by law enforcement officers of another sovereign for a different purpose could not be made without a warrant."

A close reading of *Birrell*, however, shows that case must be limited to its peculiar facts. There the defendant's personal papers were retained by city police for a longer period than legitimately required and the defendant had interposed a strenuous objection to that retention. Under those circumstances the court ruled that federal officials were required to have a search warrant for separate inspection of the papers. The decision should not be interpreted to place any absolute limitation upon the free exchange of information between police agencies. Furthermore, it has been clearly asserted elsewhere that so long as the original search does not violate defendant's fourth amendment rights, the use of evidence in a federal prosecution is permitted. *See Gullett v. United States*, 387 F.2d 307, 308 n.1 (8th Cir. 1967), *cert. denied*, 390 U.S. 1044, 88 S.Ct. 1645, 20 L.Ed.2d 307 (1968), *construing Elkins v. United States, supra.*

Since no such constitutional violation of the defendant's rights has been found on the part of state officials in this case, the use of such evidence in a federal prosecution for a different purpose shall be allowed.

### MOTION FOR A JURY TRIAL

The right to a trial by jury has been limited to serious criminal cases. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct.

---

**6.** This provision states:

THAT for the purpose of insuring compliance with this Order, duly authorized representatives of the State of New York shall be permitted access to inspect the facilities being constructed, owned, operated, maintained and/or controlled by the Respondent for the purpose of inspecting the discharge therefrom of any liquid, refuse, or other waste, to take samples of any discharge, liquid, refuse, or other waste, and for the purpose of determining the status of compliance with the terms of this Order and with State law and regulation.

**7.** *See* Cole affidavit, *supra* n. 4, at ¶ 4, 5.

1444, 20 L.Ed.2d 491 (1968). The standard promulgated by the Supreme Court as to whether an offense is serious or petty is whether imprisonment for more than six months is authorized. *Baldwin v. New York*, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970). The question whether a jury right attaches where the penalty for aggregate petty offenses exceeds six months has not been clearly resolved. The defendant has cited several cases to support its claim for aggregation of offenses to constitute a serious crime entitled to jury trial. In *Baldwin v. New York, supra,* the Supreme Court concluded that administrative convenience could not justify denial of jury trial where the *possible* penalty exceeded six months in prison. 399 U.S., at 73, 90 S.Ct. 1886. (emphasis added). In *United States v. Potvin*, 481 F.2d 380 (10th Cir. 1973), the court permitted the aggregation of two petty offenses to constitute an offense for jury trial. It found that two offenses arising from the same act which present a potential penalty of one year in prison should not be viewed any less seriously than such a penalty from a single offense. 481 F.2d, at 382. Finally, the defendant has drawn our attention to an unreported decision in *United States v. Joynt*, Crim. No. 73–065–N (D.Md. 1974). There the district court held that a jury trial was required for a defendant charged with two counts violating the Migratory Bird Treaty Act.

This court finds the reasoning of these cases persuasive in the matter before it. Although jail sentences may not be sought by the Government in this indictment, the defendant has been charged with a number of counts which, under the statute, could lead to a substantial monetary penalty in addition to the potential for prison sentence. The size of this penalty constitutes a serious offense which justifies jury consideration. The Government cannot characterize the offenses as petty and a jury trial unwarranted while, at the same time, it seeks a substantial penalty against the defendant. The criminal contempt cases cited by the Government to deny aggregation of penalties are distinguished from the case at hand since they involve entirely different principles on legal sanction.

Defendant's motion to dismiss the indictment is denied, with a direction to the Government to prepare a memorandum explaining the standard of conduct proscribed under the statute and explaining the burden placed upon the Government to prove its case; the motion to suppress is denied; and the motion for a jury trial is granted.

So ordered.